IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Civil Action No. _____ |
| WALNUTDALE FAMILY FARMS, LLC, | **COMPLAINT** |
| and | |
| KEVIN LETTINGA, | |
| *Defendants*. | |

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, and at the request of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

## NATURE OF ACTION

1.      This is a civil action brought by the United States ("Plaintiff") seeking injunctive relief and civil penalties under Section 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d), against Walnutdale Family Farms, LLC ("Walnutdale") and Kevin Lettinga  ("Defendants") for failure to comply with the conditions of two National Pollutant Discharge Elimination System ("NPDES") permits issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

1

## JURISDICTION, AUTHORITY, VENUE AND NOTICE

2.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and under 28 U.S.C. §§ 1331, 1345, and 1355.

3.      Authority to bring this action is vested in the United States Department of Justice,

on behalf of the EPA, pursuant to Section 506 of the CWA, 33 U.S.C. § 1366, and under

28 U.S.C. §§ 516 and 519.

4.      Venue is proper in the Western District of Michigan pursuant to Section 309(b) of

the CWA, 33 U.S.C. § 1319(b), as this is the judicial district within which the Defendants are

located or reside, and are doing business.

5.      Notice of the commencement of this action has been given to the State of

Michigan pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANTS

6.      Defendant Walnutdale Family Farms, LLC is a limited liability company

organized and existing under the laws of Michigan. Its place of business is located at 4309 14th

Street in Wayland, Michigan.

7.      Defendant Walnutdale Family Farms, LLC is a "person" within the meaning of

Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

8.      Defendant Kevin Lettinga is an owner and the operator of Walnutdale Family

Farms, LLC, and owns and operates, and otherwise exercises control over, the Walnutdale

Family Farms, LLC dairy farm located at 4309 14th Street in Wayland, Michigan (the

"Walnutdale Facility" or the "Facility").

9.      Kevin Lettinga is a "person" within the meaning of Section 502(5) of the CWA,

33 U.S.C. § 1362(5).

2

## RELEVANT LEGAL AUTHORITIES

**A.     The Clean Water Act**

10.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by a person from a point source to waters of the United States except as authorized by, and in compliance with, certain enumerated Sections of the CWA, including permits issued pursuant to Section 402(a) of the CWA, 33 U.S.C. § 1342(a).

11.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as, *inter alia*, "any addition of any pollutant to navigable waters from any point source."

12.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines the term "point source" as "any discernible, confined and discrete conveyance, including but not limited to any . . . concentrated animal feeding operation . . . from which pollutants are or may be discharged."

13.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines the term "pollutant" as, *inter alia,* "biological materials . . . and agricultural waste discharged into water."

14.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines the term "navigable waters" as "waters of the United States, including the territorial seas." "Waters of the United States" have been further defined to include, *inter alia*, waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce (hereinafter "Traditional Navigable Waters") and tributaries of such waters. 40 C.F.R. § 122.2 (1993).

15.     Section 402 of the CWA, 33 U.S.C. § 1342, established the National Pollutant Discharge Elimination System permit program under which EPA, or states authorized by EPA, issue permits specifying the conditions under which discharges of pollutants may occur in compliance with Section 301(a) of the CWA. Under the regulations promulgated pursuant to

Section 402, EPA or authorized states may issue individual NPDES permits to each discharger or may issue a general NPDES permit for a specific category of discharge within a geographic area. *See* 40 C.F.R. § 122.28.

16.     In 2003, EPA promulgated revised rules regulating the discharge of pollutants from Concentrated Animal Feeding Operations ("CAFOs").  *See* 68 Fed. Reg. 7176 (Feb. 12, 2003). Under the rules, a CAFO is defined as an animal feeding operation ("AFO") that can be classified as either "large" or "medium" based on the number and type of animals confined. 40 C.F.R. § 122.23(b)(2).

17.     40 C.F.R. § 122.23(b)(1) defines an AFO as a lot or facility (other than an aquatic animal production facility) where: (1) animals (other than aquatic animals) have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period; and (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.

18.     An AFO will be classified as a "Large CAFO" if it stables or confines more than 700 mature dairy cows, whether milked or dry. 40 C.F.R. § 122.23(b)(4).

19.     40 C.F.R. § 122.23(b)(7) defines process wastewater as "water directly or indirectly used in the operation of the AFO for any or all of the following: spillage or overflow from animal or poultry watering systems; washing, cleaning, or flushing pens, barns, manure pits, or other AFO facilities; direct contact swimming, washing, or spray cooling of animals; or dust control. Process wastewater also includes any water which comes into contact with any raw materials, products, or byproducts including manure, litter, feed, milk, eggs or bedding."

20.     The State of Michigan has been authorized by EPA to administer its NPDES program since October 17, 1973. *See* M.C.L.A. Ch. 324, Art. II, Ch. 1, Pt. 31. The Michigan

4

Department of Natural Resources and Environment ("MDNR") and the Michigan Department of Environmental Quality ("MDEQ") administered the NPDES permitting program in Michigan at the times relevant to this Complaint. Michigan issues a general permit for CAFOs and requires individual entities to obtain a Certificate of Coverage, by which they are covered by the general permit.

21.     When a state is authorized to administer a NPDES permit program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), EPA retains the authority, concurrent with the authorized state, to enforce state-issued NPDES permits and to take enforcement action under Section 309 of the CWA, 33 U.S.C. § 1319. 33 U.S.C. § 1342(i).

22.     Section 309(a) of the CWA, 33 U.S.C. § 1319(a), authorizes EPA to issue a compliance order or bring a civil action when EPA finds that any person is in violation of any permit condition or limitation of a permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

23.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b) authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which EPA is authorized to issue a compliance order under Section 309(a).

24.     Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, Defendants are liable for civil penalties not to exceed $37,500 per day for each violation that occurred after January 12, 2009 through November 2, 2015; and $55,800 per day for each violation that occurred after November 2, 2015.

**B.**     **Applicable Walnutdale NPDES Permits**

25.     On March 30, 2010, the Michigan Department of Natural Resources and Environment issued general CAFO NPDES Permit No. MIG019000 (the "2010 Permit"). The 2010 Permit expired on April 1, 2015.

26.     MDEQ issued Certificate of Coverage MIG010063 to Walnutdale on June 7, 2012.

27.     On April 30, 2015, MDEQ issued general CAFO NPDES Permit No. MIG010000 (the "2015 Permit").

28.     MDEQ reissued Certificate of Coverage MIG010063 to Walnutdale on December 23, 2016.

29.     The 2010 and 2015 Permits provide conditions applicable to the Facility's production area and land application areas.

30.     The 2015 Permit defines the production area to include "all areas used for animal product production activities. This includes, but is not limited to: the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment area." 2015 Permit, Part II.A. *See also* 40 C.F.R. § 122.23(b)(8).

31.     The 2015 Permit defines the land application area to include "land under the control of an AFO owner or operator . . . to which CAFO waste is or may be applied." 2015 Permit, Part II.A. *See also* 40 C.F.R. § 122.23(b)(3).

32.     The 2010 and 2015 Permits impose various requirements on the production area and land application areas of the Facility, including but not limited to prohibitions on discharges, requirements for proper operation and maintenance of waste storage devices, land application restrictions, and Comprehensive Nutrient Management Plan ("CNMP") requirements.

6

33.     Among the requirements imposed by the Permits are design and operation requirements for CAFO waste storage structures. The CAFO waste storage structures must be designed and operated at all times to contain the total volume of all of the following:

a.     Operational volume: Sufficient volume to contain all CAFO waste generated by the CAFO in a six-month or greater time period, including normal precipitation and runoff.

b.     Emergency volume: Sufficient volume to contain large rainfall events, specifically, all production area waste generated from the 25-year, 24-hour rainfall event, as specified in the Certificate of Coverage.

c.     Freeboard volume: An additional 12 inches of capacity, for storage structures that are subject to runoff caused by precipitation. 2010 Permit, Part I.A.4.a.1); 2015 Permit, Part I.B.1.a.

34.     Walnutdale's Certificate of Coverage for each of its permits states that the magnitude of the 25-year, 24-hour storm is 4.45 inches of rain.

**C.     The Consent Decree**

35.     The United States filed a complaint against Walnutdale Farms, Inc. and Ralph Lettinga and Kevin Lettinga concerning the Facility in 2002.

36.     Kevin and Ralph Lettinga previously operated the Facility through and under the name of Walnutdale Farms, Inc., which was dissolved on July 15, 2006 by the State of Michigan.

37.     That case was consolidated with a case brought by the Sierra Club and its Michigan Chapter, proceeded into fact discovery, and was resolved through a Consent Decree entered by the Court in 2004 (W.D. Mich. Civ. No. 4:00-cv-193, Dkt. 66) (the "Consent Decree").

7

38.     The Consent Decree has not been terminated and is still in effect.

39.     Paragraph 79 of the Consent Decree states that the Consent Decree "shall not be construed to prevent or limit the rights of the United States or Sierra Club to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified herein."

## GENERAL ALLEGATIONS

### A.    The Walnutdale Facility

40.     The Walnutdale Facility consists of, *inter alia*, eight free stall barns, a milking parlor, silage and feed bunkers, several manure storage structures, a slurry store, office space and machine sheds, and gravel roadways that connect these buildings and structures within the Facility.

41.     Subject to a reasonable opportunity for further investigation or discovery, at all times relevant to this Complaint, the Facility has had an approximate average of 1460 dry and milking cows.

42.     The Facility includes several lined ponds which are used to store waste generated by the operation of the CAFO, including manure and process wastewater. These ponds are called "waste storage structures" or "waste storage devices."

43.     The Facility owns or otherwise has available to it over 1100 acres of land application area.

44.     At all times relevant to this Complaint, the Walnutdale Facility was a "CAFO" as that term is defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14), and 40 C.F.R. § 122.23(b)(2).

**B.**     **Role of Kevin Lettinga**

45.     Kevin Lettinga works on-site managing the day-to-day operations at the Facility.

46.     Kevin Lettinga's initials appear on the Facility's daily/weekly CAFO inspection records as the inspector of the facility's waste storage structures.

47.     Kevin Lettinga exerts control over the contractors that land apply the manure generated at the Facility onto the Facility's land application areas.

**C.**     **April 8, 2013 Inspection**

48.     On April 8, 2013, EPA conducted an inspection of the Facility. MDEQ also participated in this inspection. The inspectors conducted a walk-through of the Facility.

49.     During the inspection, EPA observed a number of violations of the 2010 Permit conditions. Violations included a discharge of process wastewater from the Facility to Red Run Drain; inadequate depth gauges; and several violations of requirements related to the Catch Basin Waste Storage Device.

50.     EPA also conducted sampling of the discharges to determine the presence of pollutants that could impact downstream waters. The sampling results showed elevated levels of biochemical oxygen demand, nitrogen, and phosphorus.

51.     The Facility's land application area is located within the Buck Creek watershed, which is covered by a Total Maximum Daily Load for *E. coli* due to the presence of elevated *E. coli* levels in the watershed. The Facility is also located in the Rabbit River watershed, which is covered by a Watershed Management Plan and where pollutants of concern include nutrients.

**D.**     **April 18, 2013 Discharge**

52.     On April 18, 2013, MDEQ received a citizen complaint of a discharge from the Facility.

53.      MDEQ staff inspected the Facility the same day and observed a discharge of production area waste from the farm's Catch Basin Waste Storage Structure to the Red Run Drain.

54.      MDEQ issued Violation Notice VN-005611 to Kevin Lettinga on July 16, 2013 for the discharge and other violations observed at the Facility during the April 8 and April 18 inspections. MDEQ's Violation Notice states:

> The storage structure was overflowing its banks and waste was flowing to the northwest into the Red Run Drain. The farm did not notify WRD [("Water Resources Division")] staff of the overflow, nor that the manure level in the structure was in its emergency volume, both violations of your permit. As a result of this discharge, the receiving water contained E. coli numbers that exceeded water quality standards, which is a violation of PART I, Section A, 1. of your permit.

55.      Kevin Lettinga submitted a discharge report on August 29, 2013 to MDEQ. According to the discharge report, an estimated 120,000 gallons were discharged on April 18, 2013.

**E.      March 8, 2017 Inspection**

56.      EPA attempted to conduct an inspection of the Walnutdale Facility on March 8, 2017. Although not required by statute, as a courtesy, the Department of Justice provided advance notice of the inspection to Defendants' attorney.

57.      When EPA personnel arrived at the Facility, they were refused access by Aubrey VanLaan, Kevin Lettinga's daughter.

**F.      April 4, 2017 Inspection**

58.      EPA, accompanied by an attorney from the Department of Justice and Defendants' counsel, conducted an inspection of the Walnutdale Facility on April 4, 2017.

59.      During this inspection, EPA conducted a walk-through of the Facility, reviewed records on-site, and requested additional records for later review.

10

60.     During the inspection, EPA observed a number of violations of the 2015 Permit conditions, including inadequate depth gauge markers on waste storage devices and numerous violations related to the integrity of the Facility's waste storage devices.

61.     After the inspection, EPA continued its review of the Facility's records. This records review revealed a number of recordkeeping deficiencies, including but not limited to failing to retain a Land Application Log for 2015 and failing to have a nutrient analysis of its CAFO waste for 2016. The records review also indicated that the nutrient analysis for 2015 was not used to calculate the nutrient rates land applied in 2015 or 2016 and that Defendants land applied in excess of the maximum application rates, as described in greater detail in the Counts below.

**G.     The 2004 Consent Decree**

62.     Many of the permit violations observed during the 2013 and 2017 inspections are also violations of the 2004 Consent Decree.

**COUNT ONE**
**FAILURE TO MEET PERMIT REQUIREMENTS FOR AUTHORIZED**
**DISCHARGE OF POLLUTANTS**

63.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

64.     The 2010 Permit defines discharge as "the addition of any waste, waste effluent, wastewater, pollutant, or any combination thereof to any surface water of the state." 2010 Permit Part II.A.

65.     Mich. Comp. Laws. § 324.3101(aa) defines waters of the state as "groundwaters, lakes, rivers, and streams and all other watercourses and waters, including the Great Lakes, within the jurisdiction of this state."

66.     The 2010 Permit authorizes a discharge only where certain conditions are met and where the discharge does not cause or contribute to an exceedance of Michigan's Water Quality Standards. The allowed discharges are:

a.     CAFO waste in the overflow from the storage structures for cattle . . . when all of the following conditions are met:
1)     These structures are properly designed, constructed, operated, and maintained.
2)     Precipitation events cause an overflow of the storage structures to occur.
3)     The production area is operated in accordance with the requirements of this permit.
b.     Precipitation caused runoff from land application areas and areas listed in Part I.A.4.b.8 [related to Non-Production Area Storm Water Management] that are managed in accordance with the NMP.

2010 Permit, Part I.A.1.

67.     The 2010 Permit defines "CAFO Waste" as CAFO process wastewater, manure, production area waste, effluents from the property and successfully operated treatment system or any combination thereof.  2010 Permit Part II.A.

68.     The 2010 Permit defines "CAFO Process Wastewater" as "water directly or indirectly used in the operation of a CAFO for" (1) "[s]pillage or overflow from animal or poultry watering systems" (2) "[w]ashing, cleaning or flushing pens, barns, manure pits or other AFO facilities" (3) "[d]irect contact swimming, washing, or spray cooling of animals" (4) "[d]ust control" and (5) "[a]ny water which comes into contact with, or is a constituent of any raw materials, products, or byproducts, including manure, litter, feed, milk, eggs or bedding."

69.     On April 8, 2013, Defendants discharged CAFO Process Wastewater from the Feed Storage Area of the Facility. The process wastewater bypassed the designed wastewater collection system and flowed to Red Run Drain, a surface water of the state of Michigan.

70.     On April 18, 2013, Defendants discharged an estimated 120,000 gallons of production area manure and CAFO Process Wastewater from the Catch Basin Waste Storage Structure at the Facility to Red Run Drain.

71.     The April 8, 2013 discharge was a discharge of CAFO Waste and was not authorized by the NPDES Permit, in violation of Part I.A.1 and Part I.A.3 of the 2010 Permit.

72.     The April 18, 2013 discharge was a discharge of CAFO Waste and was not authorized under Part I.A.1. of the 2010 Permit because Defendants failed to properly design, construct, operate, and/or maintain the Catch Basin Waste Storage Structure, in violation of Part I.A.1.a.1 and Part I.A.3. of the 2010 Permit.

73.     The April 8, 2013 discharge violated Part I.A.3 of the 2010 Permit, which prohibits discharges not authorized by the permit.

74.     The April 18, 2013 discharge violated Part I.A.3 of the 2010 Permit, which prohibits discharges not authorized by the permit.

75.     Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

76.     As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

## COUNT TWO
## FAILURE TO REPORT DISCHARGE

77.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

78.     The 2010 Permit requires that "[a]ll instances of discharge or noncompliance shall be reported as follows:

> a.   6-hour reporting – Any discharge shall be reported, verbally, as soon as practicable but no later than 6 hours from the time the permittee becomes aware of the discharge. A written report shall also be provided within five (5) days.
>
> b.   other reporting – The permittee shall report, in writing, all other instances of noncompliance not described in a. above at the time monitoring reports are submitted; or, in the case of retained self-monitoring or inspection results or records, within five (5) days from the time the permittee becomes aware of the noncompliance."

2010 Permit, Part II.C.6.

79.     On April 18, 2013, Defendants discharged an estimated 120,000 gallons of manure and process wastewater in violation of Part I.A.1 the 2010 Permit.

80.     Defendants did not report this discharge to MDEQ within six hours of becoming aware of the discharge, in violation of Part II, Section C(6) of the 2010 Permit.

81.     Only after a citizen complaint, an investigation by MDEQ, and a violation notice issued by MDEQ, did Kevin Lettinga report the discharge, on August 29, 2013.

82.     Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

83.     As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

**COUNT THREE**
**FAILURES TO REPORT EMERGENCY VOLUME LEVEL IN WASTE STORAGE**
**DEVICE**

84.    Paragraphs 1 through 62 are re-alleged and incorporated by reference.

85.    The 2010 Permit requires: "In the event that the level of CAFO waste in the storage structure rises above the maximum operational volume level and enters the emergency volume level, [MDEQ] shall be notified." 2010 Permit, Part I.A.4.a.4)a).

86.    On April 8, 2013, EPA observed that the level of waste in the Catch Basin Waste Storage Structure had entered the freeboard volume level.

87.    Defendants did not notify MDEQ that the level of CAFO waste in the structure had risen above the maximum operational volume level and had entered, and in fact exceeded, the structure's emergency volume level, in violation of Part I.A.4.a.4)a) of the 2010 Permit.

88.    On April 8, 2013, EPA observed that the level of waste in the temporary manure storage pit adjacent to hoop barn B7 had entered the freeboard volume level.

89.    Defendants did not notify MDEQ that the level of CAFO waste in the structure had risen above the maximum operational volume level, and had entered and even exceeded the structure's emergency volume level, in violation of Part I.A.4.a.4)a) of the 2010 Permit.

90.    On April 18, 2013, MDEQ visited the Facility in response to a discharge from the Catch Basin Waste Storage Structure.

91.    Defendants had not notified MDEQ that the level of CAFO waste in the structure had again risen above the maximum operational volume level and entered the emergency volume level, in violation of Part I.A.4.a.4)a) of the 2010 Permit.

15

92.     A combination of EPA and MDEQ inspections and reports by the Facility indicate that at numerous points between March 31, 2013 and April 29, 2013, the Catch Basin Waste Storage Structure at the Facility had less than 12 inches of capacity remaining.

93.     Having less than 12 inches of capacity remaining in the Catch Basin Waste Storage Structure means that the level of waste in the structure had risen above the maximum operational volume level, and had entered and even exceeded the emergency volume level.

94.     Defendants failed to notify MDEQ, in violation of Part I.A.4.a.4)a) of the 2010 Permit.

95.     Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

96.     As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

## COUNT FOUR
## FAILURE TO MAINTAIN DEPTH GAUGES

97.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

98.     The 2010 Permit requires that "CAFO waste storage structures shall include an easily visible, clearly marked depth gauge. Clear, major divisions shall be marked to delineate each of the three volumes specified above in Part I.A.4.a.1) . . . Any depth gauges that are destroyed or missing must be replaced immediately." 2010 Permit, Part I.A.4.a.2)a).

99.     The 2015 Permit requires that "CAFO waste storage structures shall include an easily visible, clearly marked depth gauge. Clear, major divisions shall be marked to delineate

the operational, emergency, and freeboard volumes as specified above in Part I.B.1.a . . . Any depth gauges that are destroyed or missing must be replaced immediately." Part I.B.1.b.1).

100.    On April 8, 2013, EPA observed that the Facility's Catch Basin Waste Storage Structure did not contain a depth gauge, in violation of Part I.B.1.b.1) of the 2015 Permit and Part I.A.4.a.2)a) of the 2010 Permit.

101.    On April 8, 2013, EPA also observed that the depth gauge at the East Manure Storage Facility did not have the levels clearly marked for the operational, emergency, and freeboard volume, in violation of Part I.B.1.b.1) of the 2015 Permit and Part I.A.4.a.2)a) of the 2010 Permit.

102.    On April 4, 2017, EPA observed that the Catch Basin Waste Storage Structure still did not contain an adequate depth gauge. The depth gauge that was present marked only the freeboard level, and did not mark the operational or emergency level, in violation of Part I.B.1.b.1) of the 2015 Permit.

103.    On April 4, 2017, EPA observed that the East Manure Storage Facility (identified as Pit 8 in the 2017 inspection report) also still did not contain an adequate depth gauge. A marker was present, but Facility personnel did not know what level the marker represented. No other marker was present that would reflect the remaining unused capacity of the storage device—i.e., the operational, emergency, and freeboard volume—in violation of Part I.B.1.b.1) of the 2015 Permit.

104.    Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

105.    As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 22.

## COUNT FIVE
## FAILURE TO MAINTAIN INTEGRITY OF WASTE STORAGE STRUCTURES

106.    Paragraphs 1 through 62 are re-alleged and incorporated by reference.

107.    The 2010 Permit requires: "The integrity of the CAFO waste storage structure liner shall be protected. Liner damages shall be corrected immediately and steps taken to prevent future occurrences." 2010 Permit, Part I.A.4.a.4)e).

108.    The 2015 Permit, Part I.B.1.d.5), contains identical language.

109.    The 2015 Permit also requires that "[w]oody vegetation shall be removed promptly from waste storage berms and other areas where roots may penetrate or disturb waste storage facility liners or waste treatment facilities." 2015 Permit, Part I.B.1.d.3).

110.    The 2010 Permit requires that "[v]egetation shall be maintained at a height that stabilizes earthen CAFO waste storage structures, provides for adequate visual inspection of the storage structures, and protects the integrity of the storage structure liners. The vegetation shall have sufficient density to prevent erosion." 2010 Permit, Part I.A.4.a.4)c). The 2015 Permit, Part I.B.1.d.3), contains identical language.

111.    The 2015 Permit requires that "[d]ike damage caused by erosion, slumping, or animal burrowing shall be corrected immediately and steps taken to prevent occurrences in the future." 2015 Permit, Part I.B.1.d.4).

112.    On April 8, 2013, EPA observed large bubbles in the liner of the Catch Basin Waste Storage Structure, in violation of Part I.A.4.a.4)e) of the 2010 Permit.

18

113.    The liner bubbles, which are caused by gas becoming trapped under the liner, significantly decrease the amount of available space in the structure.

114.    On April 8, 2013, EPA observed that there were non-vegetated animal walkways on the berms of the Catch Basin Waste Storage Structure, in violation of the requirements in Part I.A.4.a.4)c) of the 2010 Permit to maintain vegetation around earthen waste storage structures.

115.    On April 4, 2017, EPA observed woody vegetation that had punctured the liner of the East Manure Storage Facility (Pit 8), in violation of Parts I.B.1.d.5) and I.B.1.d.3) of the 2015 Permit.

116.    On April 4, 2017, EPA observed that the liner of the East Manure Storage Facility (Pit 8) was not present in some sections, in violation of Part I.B.1.d.5) of the 2015 Permit.

117.    On April 4, 2017, EPA observed that the Catch Basin Waste Storage Structure lacked established vegetation along portions of the west embankment, in violation of Part I.B.1.d.3) of the 2015 Permit.

118.    On April 4, 2017, EPA observed that damage caused by burrowing animals was present at the Catch Basin Waste Storage Structure's east embankment, in violation of Part I.B.1.d.4 of the 2015 Permit.

119.    Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

120.    As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 22.

## COUNT SIX
## FAILURE TO INSPECT WASTE STORAGE STRUCTURES

121.    Paragraphs 1 through 62 are re-alleged and incorporated by reference.

122.    The 2015 Permit requires Defendants to "develop a Storage Structure Inspection Plan and inspect the CAFO waste storage structures a minimum of one time weekly year round. The inspection plan shall be included in the CNMP and results of the inspections shall be kept with the CNMP on a form provided by the Department. Individual results shall be kept for a period of five years." 2015 Permit, Part I.B.1.c.

123.    The 2015 Permit requires that the inspection plan include inspections of the CAFO waste storage structures for "cracking, inadequate vegetative cover, woody vegetative growth, evidence of overflow, leaks, seeps, erosion, slumping, animal burrowing or breakthrough, and condition of the storage structure liner." 2015 Permit, Part I.B.1.c.1).

124.    The 2015 Permit requires the plan to include the "depth of waste in the storage structure and the available operating capacity as indicated by the depth gauge." The inspection should also include the "collection system, lift stations, mechanical and electrical systems, transfer stations, control structures, and pump stations to assure that valves, gates, and alarms are set correctly and all are properly functioning." 2015 Permit, Part I.B.1.c.

125.    The review of records at and following EPA's April 4, 2017 inspection revealed that the Facility's records did not reflect that it conducted required weekly maintenance inspections of the waste storage devices, piping, transfer lines, or catch basins, in violation of Part I.B.1.c of the 2015 Permit.

126.    The maintenance and structural integrity problems at the Catch Basin Waste Storage were not documented on the weekly inspection forms, in violation of Part I.B.1.c of the 2015 Permit.

127.    The review of records at and following EPA's April 4, 2017 inspection revealed that the maintenance and structural integrity problems at the East Manure Storage Facility (Pit 8) were not documented on the weekly inspection forms, in violation of Part I.B.1.c of the 2015 Permit.

128.    Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

129.    As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

## COUNT SEVEN
## FAILURE TO COMPLY WITH MAXIMUM ANNUAL LAND APPLICATION REQUIREMENTS

130.    Paragraphs 1 through 62 are re-alleged and incorporated by reference.

131.    The 2010 and 2015 Permit sets limits on the land application of phosphorus and nitrogen:

A)    If the Bray P1 soil test result is 150 parts per million (ppm) or more, CAFO waste applications shall be discontinued until nutrient use by crops reduces the Bray P1 soil test result to less than 150 ppm P.

B)    If the Bray P1 soil test result is 75 ppm P or more, but less than 150 ppm P, application rates shall be based on the maximum rates of phosphorus (P) in annual pounds per acre as calculated [based on realistic yield per acre].

2010 Permit, Part I.A.4.b.7)c).

> The total amount of N and P, regardless of source (manure, organic waste, commercial fertilizer, etc.), shall not exceed the first crop year nutrient requirements unless applying multiple crop years of P as allowed in 2) below [permitting up to two year of P to be applied at one time if the one year rate is impractical due to spreading equipment or crop production management but no P may be applied to that field for the second year]. However, only one year of N can be applied as stated in c) above [application rate shall not exceed N fertilizer recommendation for first crop year grown after CAFO waste applied], unless samples or other relevant data shows additional N is needed for or will be beneficial to the crop.  Documentation justifying additional N must be kept with the farm's CNMP.

2015 Permit, Part I.B.3.c.1)e).

132.     For fields with a Bray P1 soil test of 75-150 ppm of phosphorus, realistic yield per acre calculations are provided in the permit for various crops. These rates provide the maximum annual application rates of CAFO waste to be land applied per acre per year. The rate is based on the first crop planned after the application of CAFO waste.

133.     The 2010 Permit provides that "[i]f the one year rate is impractical due to spreading equipment or crop production management, the permittee may apply up to two years of [phosphorus] at one time, but no [phosphorus] may be applied to that field for the second year." 2010 Permit. Part I.A.4.b.7)c)B). Application is generally recorded for each "crop year," which runs from September to September.

134.     The Facility's records show that between May 1, 2013 and August 1, 2013, (during Crop Year 2013) Defendants land applied phosphorus-containing CAFO waste on five fields with a Bray P1 soil result of 75 to 150 ppm despite two years of phosphorus having been applied during the previous crop year, in violation of Part I.A.4.b.7)c)B) of the 2010 Permit.

135.    Based on the Facility's records, during Crop Year 2015, Defendants land applied phosphorus-containing CAFO waste despite two years of phosphorus having been applied during the previous crop year.

136.    The Facility's records also show that on May 1, 2013 (during Crop Year 2013), on a field with a Bray P1 soil test result of 75 to 150 ppm, Defendants land applied in excess of the maximum application rate for phosphorus for the first crop planned after the application of CAFO waste, in violation of Part I.A.4.b.7)c)B) of the 2010 Permit.

137.    The Facility's records also show that on four occasions between May 1, 2014 and June 9, 2014 (during Crop Year 2014), on fields with a Bray P1 soil test result of 75 to 150 ppm, Defendants land applied in excess of the maximum application rate for phosphorus for the first crop planned after the application of CAFO waste or exceeded the rate for two years, in violation of Part I.A.4.b.7)c)B) of the 2010 Permit.

138.    Subject to a reasonable opportunity for further investigation or discovery, on two occasions during Crop Year 2016, on fields with a Bray P1 soil test result of 75 to 150 ppm, Defendants land applied in excess of the maximum application rate for phosphorus for the first crop planned after the application of CAFO waste, in violation of Part I.A.4.b.7)c)B) of the 2010 Permit.

139.    The Facility's 2018 Annual Report (required under the NPDES Permit), shows that Defendants applied nitrogen on nine fields at a rate that exceeded the maximum land application rate for nitrogen, without providing proper sampling or documentation for the need for the additional nitrogen in violation of Part I.B.3.c.1)e) of the 2015 Permit.

140.     Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

141.     As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

## COUNT EIGHT
## FAILURE TO RECORD ACCURATE INFORMATION REGARDING LAND APPLICATION

142.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

143.     The 2015 Permit requires that the "results of land application inspections, monitoring, testing, and recordkeeping shall be recorded in a 'Land Application Log' which shall be kept up-to-date and kept with the CNMP." 2015 Permit, Part I.B.3.d. These records must be kept for a minimum of five years. *Id.*

144.     The 2015 Permit also requires Defendants to document the records required by Part I.B.3 (related to land application of CAFO waste) as well as information and inspection results of:

1)    Daily Land Application Record
    a)    The time, date, quantity, method, location, and application rate for each location at which CAFO wastes are land applied
    b)    A written description of weather conditions at the time of application and for 24 hours prior to and following application based on visual observation
    c)    a statement whether the land was frozen or snow-covered at the time of application

2)    Annual Report Form
    a)    The crop, the realistic yield goal, and actual yield for each

location at which CAFO wastes are land applied

b) Methodology and calculations showing the total nitrogen and phosphorus to be applied to each field receiving CAFO waste, identifying all sources of nutrients, including sources other than CAFO waste

c) The total amount of nitrogen and phosphorus actually applied to each field receiving CAFO waste, irrespective of source, including documentation of calculations for the total amount applied

3) Printouts of weather forecasts from the time of land application. Weather forecasts may also be saved as electronic files, in which case the files do not need to be physically located in the Land Application Log, but the log shall reference the location where the files are stored.

2015 Permit, Part I.B.3.d.

145.    The review of records at and following EPA's April 4, 2017 inspection showed that the Facility does not have a Land Application Log for 2015, in violation of Part I.B.3.d of the 2015 Permit.

146.    The review of records at and following EPA's April 4, 2017 inspection showed that the land application record for field D-19 on March 28, 2017 was incomplete, failing to contain the rate applied, in violation of the requirements in Part I.B.3.d of the 2015 Permit to keep daily land application records.

147.    The review of records at and following EPA's April 4, 2017 inspection showed a discrepancy between the amount of slurry land applied in 2015 and the amount of slurry documented as pumped from the slurry tank, in violation of the requirement in Part I.B.3.d of the 2015 Permit to record the quantity of CAFO waste applied in daily land application records to be included in the Land Application Log.

148.    The Facility's 2019 Annual Report, reporting for Crop Year 2018, shows that Defendants did not take into account the additional nitrogen made available by the

mineralization of organic nitrogen in the manure from previous applications, in violation of the requirement in Part I.B.3.d.2)b) of the 2015 Permit.

149. The Facility's 2017 crop and nutrient balance report provided information regarding manure type and source that was inconsistent with the Facility's manure analysis report for 2017, preventing an accurate calculation of second year nitrogen manure credits, in violation of Part I.B.3.d.2)b) of the 2015 Permit.

150. Subject to a reasonable opportunity for further investigation or discovery, unless restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the manner described in this Count.

151. As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

<u>**COUNT NINE**</u>
<u>**FAILURE TO CONDUCT MANURE SAMPLING**</u>

152. Paragraphs 1 through 62 are re-alleged and incorporated by reference.

153. The 2015 Permit details requirements for sampling CAFO waste and the fields to which the CAFO waste will be applied prior to land application. 2015 Permit, Part I.B.3.b.

154. The 2015 Permit requires that "CAFO waste shall be sampled a minimum of once per year to determine nutrient content and analyzed for total Kjeldahl nitrogen (TKN), ammonium nitrogen, and total phosphorus. CAFO waste shall be sampled in a manner that produces a representative sample for analysis. Guidance for CAFO waste sampling is available through Bulletin NCR 567 produced by the Michigan State University Extension . . . CAFO waste test results shall be used to determine land application rates as described in c) [relating to

26

land application rates] below. Record the nutrient levels and analysis methods in the Land

Application Log and include in the CNMP." 2015 Permit, Part I.B.3.b.1).

155.    The review of records at and following EPA's April 4, 2017 inspection shows that

the Facility does not have records to show that it performed a nutrient analysis of its CAFO

waste for 2016, in violation of Part I.B.3.b of the 2015 Permit.

156.    The review of records at and following EPA's April 4, 2017 inspection shows that

the Facility's manure nutrient analysis for 2015 was not used to calculate the nutrient rates land

applied in 2015 or 2016, in violation of Part I.B.3.b.1) of the 2015 Permit.

157.    Subject to a reasonable opportunity for further investigation or discovery, unless

restrained by this Court, Defendants will continue to violate the terms of its NPDES permit in the

manner described in this Count.

158.    As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the

CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of

civil penalties up to the statutory maximum set forth in Paragraph 24.

## COUNT TEN
### FAILURE TO MAKE NUTRIENT MANAGEMENT PLAN AVAILABLE

159.    Paragraphs 1 through 62 are re-alleged and incorporated herein by reference.

160.    The 2010 Permit requires Defendants to "allow [MDEQ or EPA] . . . at

reasonable times to have access to and copy any records required to be kept under the terms and

conditions of this permit." 2010 Permit, Part II.D.8.

161.    The Nutrient Management Plan ("NMP") is required to be kept under Part I.B.4.

of the 2010 Permit.

162.    The NMP was not available for inspection at the April 8, 2013 inspection, in violation of Part II.D.8. of the 2010 Permit.

163.    As a result of the above-listed violation, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

## COUNT ELEVEN

### FAILURE TO MEET THE OPERATIONAL VOLUME IN THE CAFO WASTE STORAGE STRUCTURES DURING THE PERIOD OF NOVEMBER 1 TO DECEMBER 31 OF EACH YEAR AND FAILURE TO SUMBIT NOTIFICATION THEREOF

164.    Paragraphs 1 through 62 are re-alleged and incorporated herein by reference.

165.    The 2015 Permit requires that "[a]t some point in time during the period of November 1 to December 31 of each year, there shall be an available operational volume in the CAFO waste storage structures equal to the volume of CAFO waste generated from the operation of the CAFO in a six-month or greater time period (including normal precipitation and runoff in the production area during the same time period). The date of this occurring shall be recorded in the CNMP and reported to the Department in accordance with Part II.C.5, Compliance Dates Notification." 2015 Permit, Part I.B.1.d.2).

166.    The 2015 Permit at Part II.C.5 requires that within 14 days of every compliance date specified in the permit, the permittee shall "submit a *written* notification to [the State of Michigan] indicating whether or not the particular requirement was accomplished. If the requirement was not accomplished, the notification shall include an explanation of the failure to accomplish the requirement, actions taken or planned by the permittee to correct the situation, and an estimate of when the requirement will be accomplished."

167.    The Facility failed to report that the Facility's waste storage structures contained available operational volume equal to the volume of CAFO waste generated from the operation of the CAFO in a six-month or greater time period by December 31, 2018.

168.    As a result of the above-listed violation, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b), (d), Defendants are liable for injunctive relief and the assessment of civil penalties up to the statutory maximum set forth in Paragraph 24.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America, requests that this Court:

A.    Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), order such injunctive relief as appropriate to secure compliance with the conditions and limitations of the applicable NPDES permit and to prevent Defendants from discharging pollutants from the Walnutdale Facility, except as expressly authorized by an NPDES permit.

B.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), assess against Defendants civil penalties not to exceed $37,500 per day for each violation of a NPDES permit occurring on or after January 12, 2009 through November 2, 2015, and $53,833 per day for each violation of a NPDES permit that occurred after November 2, 2015.

C.    Award the United States the costs and disbursements of this action and grant such further relief as the Court may deem just and appropriate.

Dated: May 7, 2020

RESPECTFULLY SUBMITTED,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.

*/s/ Lauren D. Grady*
LAUREN D. GRADY (IL# 6315393)
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-2794
Facsimile: (202) 514-6584
Email: lauren.grady@usdoj.gov

ANDREW B. BIRGE
United States Attorney
Western District of Michigan

RYAN COBB
Assistant United States Attorney
Western District of Michigan
330 Ionia Ave., NW
Suite 501
Grand Rapids, MI 49503

30